NAM  RFT

04 CV 0568

04-CV-0946

# PETITION UNDER 28 USC § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

**United States District Court for the WESTERN District of New York**

FILED
U.S. DISTRICT COURT – W.D. OF N.Y.
AUG – 9 2004
AT _____ O'CLOCK
Lawrence K. _____

| | |
|---|---|
| Name<br>MALIK ROBERTSON | Prisoner Identification No.<br>01B2810 |

Place of Confinement

CLINTON CORRECTIONAL FACILITY, P.O. BOX 2001, DANNEMORA, N.Y. 12929

Name of Petitioner (include name under which convicted)

MALIK ROBERTSON

Name of Respondent (authorized person having custody of your prison)

**v.**   DALE ARTUS

## PETITION

1. Name and location of court which entered the judgment of conviction under attack     SUPREME COURT – ONONDAGA COUNTY.

2. Name and address of lawyer who represented you     **RANDI BIANCA & TOM MILLER**

3. Date of judgment of conviction     **NOVEMBER 2001**

4. Length of sentence     **40 to LIFE**

5. Nature of offense involved (all counts)     **MURDER IN THE SECOND DEGREE & ATTEMPT MURDER IN THE SECOND DEGREE**

6. What was your plea? (Check one)
   (a)  Not guilty     ☒
   (b)  Guilty     ☐
   (c)  Nolo contendere     ☐

   If you entered a guilty plea to one count of indictment, and not a guilty plea to another count of indictment, give details:

   NONE

7. If you pleaded not guilty, what kind of trial did you have? (Check one)

2009 JUL 29 AM 11:26
FILED U.S. DISTRICT COURT
W.D.N.Y. BUFFALO



#1

7. If you pleaded not guilty, what kind of trial did you have?  (Check one)
   (a)   Jury          ☒
   (b)   Judge only    ☐

8. Did you testify at the trial?
   Yes ☐    No ☒

9. Did you appeal from the judgment of conviction?
   Yes ☒    No ☐

10. If you did appeal, answer the following:

   (a)   Name of court___APPELLATE DIVISION: FOURTH DEPARTMENT_____

   (b)   Name and address of lawyer who represented you   PHILIP ROTHSCHILD, HISCOCK LEGAL AID SOCIETY, 351, SOUTH WARREN STREET, SYRACUSE, NEW YORK 13202.

   (c)   Result___CONVICTION AFFIRMED_____

   (d)   Date of result and citation, if known ___ENTERED FEBRUARY .7, 2003___

   (e)   Grounds raised_____SEE ATTACHED PAGES # 1-14 HEREIN._____

   (f)   If you sought further review of the decision by appeal to a higher state court, please answer the following:

      (1) Name of court__NEW YORK STATE COURT OF APPEALS_____

      (2) Name and address of lawyer who represented you_____SAME AS LISTED ABOVE____

      (3) Result_____DENIED LEAVE TO APPEAL_____

      (4) Date of result and citation, if known_____MAY 27, 2003_____

      (5) Grounds raised_____SEE ATTACHED PAGES # 1-14 HEREIN._____

   (g)   If you filed a petition for Writ of Certiorari in the United States Supreme Court, please provide the date the petition was filed and the date of result and citation; if known
                        DID NOT FILE.

                                      NONE
      (1) Name and address of lawyer who represented you_____

11. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?

Yes ☐     No ☒

12. If your answer to 11 was "yes," give the following information:

(a) (1) Name of court _____ NONE _____

(2) Name and address of lawyer who represented you _____ NONE _____

(3) Nature of proceeding _____ NONE _____

(3) Grounds raised _____ NONE _____

_____

_____

_____

(4) Did you receive an evidentiary hearing on your petition, application or motion?

Yes ☐          No ☐          DOES NOT APPLY TO PETITIONER

(5) Date motion was filed with the Court _____ NONE _____

(6) Date and result of motion _____ DOES NOT APPLY _____

(b) As to any second petition, application or motion give the same information:

(1) Name of court _____ NONE _____

(2) Name and address of lawyer who represented you _____ NONE _____

(3) Nature of proceeding _____ NONE _____

(4) Grounds raised _____ NONE _____

_____

_____

_____

(5) Did you receive an evidentiary hearing on your petition, application or motion?

Yes ☐          No ☐          .          DOES NOT APPLY

(6) Date motion was filed with the Court _____ NONE _____

(7) Date and result of motion _____ NONE _____

(c) Did you appeal to the highest state court having jurisdiction the decision on any petition, application or motion?

(1) First petition, etc.     Yes ☐     No ☐

(2) Second petition, etc.    Yes ☐     No ☐     DOES NOT APPLY TO PETITIONER.

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

NONE

13.   STATE EVERY GROUND ON WHICH YOU CLAIM THAT YOU ARE BEING HELD UNLAWFULLY . EACH GROUND SHOULD BE SET FORTH UNDER A SEPARATELY NUMBERED PARAGRAPH . IF YOU ARE RAISING THE SAME GROUNDS THAT YOU RAISED ON DIRECT APPEAL , YOU SHOULD ATTACH A COPY OF YOUR STATE COURT APPELLATE BRIEF OR ITS TABLE OF CONTENTS . YOU MUST EXHAUST YOUR STATE COURT REMEDIES ON EACH GROUND YOU ARE CLAIMING YOU ARE BEING HELD UNLAWFULLY .

Ground(s):

SEE ATTACHED PAGES HEREIN # 1-14, FOR GORUNDS RAISED AND SUPPORTING FACTS.

## <u>GROUNDS RAISED AND SUPPORTING FACTS</u>

### <u>*POINT I.*</u>

**APPELLANT'S RETRIAL AND CONVICTION VIOLATED HIS RIGHTS AGAINST DOUBLE JEOPARDY, AND WAS CONTRARY TO WELL ESTABLISHED LAW. U.S. CONST. AMENDS. VI, XIV. N.Y. CONST. ART 1 § 6.**

In the present case, defense counsel moved for a dismissal at the close of the People's case in the first and second trial, noting a lack of proof of intent, as there was no evidence that Appellant or anyone else could see into the heavily tinted windows, could see who was in the drivers seat, and the proof at trial militated against intent to kill the driver as the shots were fired through the passenger window. [T1. 893-894] [T2. 978-979].

Defense counsel pointed out that both the indictment and bills of particulars listed only the intentional murder count, and there were no alternative theories of liability, such as depraved indifference. After a twenty page discussion in the first trial, the lower court reached the erroneous decision that the jury would be told that the People must prove the intent to cause the death of the person who was seated in the driver's seat, who was later identified as the decedent. [T1. 1104].

The jury at the first trial underscored the proof problems, asking the court for clarification on intent and asking if they had to find specific intent against a particular person named in each charge, or just intent to murder the driver and passenger, as they needed to consider whether Appellant or the shooter knew who as in the car. [T1. 1091].

Despite such improper instructions by the trial court, it was apparent that the People failed to establish all of the elements of the crimes that they were required to prove, namely Appellant's specific intent to kill the decedent. There was no proof that Appellant could see

1

into the car that had mirror-tinted windows, nor was there proof that Appellant heard or saw the decedent in the brief moment that he rolled down the window to talk to a friend. As noted above, proof of specific intent to kill decedent was vitiated by the fact that the shooter fired bullets from the passenger side window.

The proof of specific intent was insufficient as a matter of law in that the People did not even set out a prima facie case. Defense counsel's motion at the close of the People's proof should have been granted.

The subsequent retrial and conviction in this case, violated the double jeopardy clause of the New York and United States Constitutions and was contrary to well established law. **U.S. Const. Amends. VI, XIV; N.Y. Const. Art. 1 § 6.**

## POINT II.

## THE LOWER COURT'S INSTRUCTION ON INTENT AMOUNTED TO AN IMPERMISSIBLE AMENDMENT OF THE INDICTMENT AND WAS CONTRARY TO WELL ESTABLISHED LAW. U.S. CONST. AMENDS. VI, XIV; N.Y. CONST. ART 1 § 6.

In the first trial the jury sent a note asking for clarification of intent, and whether the people had to prove that appellant had a specific intent to kill the person enumerated in each count of the indictment, or just an intent to kill the driver and the passenger.

In response the defense naturally answered yes and the prosecution said no. The defense pointed out that the words of the indictment were clear, the bill of particulars did not elucidate or suggest anything other that a specific intent to kill those persons enumerated, the People never moved to amend or supersede the indictment, and there was no mention of depraved indifference as an alternative theory of liability.

Nevertheless, the trial court bruited about the matter, and unlike Solomon, decided to actually split the difference, which resulted in mortal injury to appellant's case. The court told the jury that the People must prove the intent to cause death of the person who was seated in the driver's seat who was later identified as [decedent]. [T1. 1104].

Defense counsel objected to this instruction in the first trial as an impermissible amendment of the indictment. [T1. 1106]. During the third trial defense counsel again asked the prosecution be held to the indictment, namely having to prove that appellant intended to kill him. In response the court said that it would reiterate its charge from the two prior trials, and ruled that such charge was not constructive amendment of the indictment [T3. 919-921].

The trial court's determination aside, a cursory review of the indictment and bill of particulars reveals that the only crime alleged was intentional murder under Penal Law §

3

125.25(1), which requires the specific intent to kill a specific person. Other sections of the statue deal with deprave indifference or liability for the homicides committed in the course of other felonies. At bar there was no such amendment or superseding indictment.

The net effect was not only to deprive the defense of an adequate notice of the basis for the charges, but also a practical lessening of the People's burden of proof. The very issue that hung up the jury at the first trial, namely whether the People had to prove that appellant knew who was in the driver's seat (i.e. who he intended to kill) was no longer something the People had to prove.

Here the lower court's ruling deprived appellant of a fair trial and was contrary to well established law. U.S. Const. Amends. VI, XIV; N.Y. Const. Art. 1 § 6.

4

## *POINT III.*

### THE VERDICT WAS BASED ON INSUFFICIENT EVIDENCE AND WAS AGAINST THE WEIGHT OF THE EVIDENCE. U.S. CONST. AMENDS. VI, XIV; N.Y. CONST. ART § 1. 6.

In the case at bar, neither the first, second nor third trial provided proof that appellant specifically intended to kill decedent or attempted to kill Dayron Bennett, a crucial element of both charges in the indictment (see Point II, supra). Thus it could not be said as a matter of law that the People set forth an adequate case to withstand dismissal (T3. 912-914).

In considering the evidence, the jury could have easily reached the opposite conclusion. Only one person at the Third trial said that he actually saw appellant pull the trigger, and that was Dayton Bennett. The only other (one) eyed witness, Percy Jones, was not called by the People, probably in view of the fact that discrepancies, falsehoods and problems in his testimony were exposed at two prior trials, leading the trial assistance to conclude that he was not reliable.

Among the disturbing anomalies in Dayton Bennett's testimony, the one that the prosecution could not escape was the fact that the person who shot him wore a black leather coat; while every other witness said that they saw appellant in a red Avirex jacket, red Coogi sweater and red bandana. The fact that appellant stood out like Santa Clause enabled so many witnesses to spot and remember him. Even Dayton Bennett said that he saw appellant dressed in red scant minutes before the shooting.

Lamont Cooper, who said that he saw appellant shooting an unidentified gun perhaps a minute after the shooting, said that he saw appellant dressed in all red as well. The People didn't even attempt to reconcile this obvious discrepancy.

5

Dayron Bennett's account was incredible in a number of other ways Over and over he told the police that he didn't recognize the shooter. Later he said that he kept it from that authorities so he could exact his own revenge. The only problem was that when he spoke to his close personal friends after the shooting, he never told them that appellant was the shooter. The prosecutor explained away Bennett not telling the police as part of the 'code of the streets, but had no explanation for not telling friends or family. Bennett went to such lengths as to say that he never even spoke with his brother about the incident, despite the fact that it was his car that was shot up.

Bennett claimed that he met appellant in 1995 and saw him once or twice a month, was belied by the fact that Bennett was in state prison for a good chunk of that time. Bennett's belated claim that appellant saw him while he was visiting a friend was further belied by the fact that Bennett was transferred to four separate facilities during his incarceration, meaning that appellant's friend would have had to be transferred at the same time to the same four facilities.

At trial Bennett was certain that appellant was the only person holding the gun that evening. That is, until he was confronted on cross-examination with his prior sworn testimony that there was another person standing outside the car with a gun. He described that person as a shadow, about the same height and build as him, about 21 years old with a thin mustache, long sideburns and a goatee.

None of the other witnesses saw the actual shooting. There were three girls in a car across the street, only two of which testified at the third trial. Antonisha Owens saw appellant (dressed in red) across the street from the bar in a dark grassy lot with Derval Adams (dressed in black) and another person. She saw only appellant bend down to pick up a black

semiautomatic gun from under a car wheel. The car she was in was parked behind a small car. Owens never told the police or the grand jury that appellant's gun was a semiautomatic (T3. 760-761).

Star Crawford was the front seat passenger in the same car. Unlike Owens, she said that the car was parked behind a red minivan; also that appellant was not the only one to pick up a gun, as Deval Adams also picked up and was carrying what appeared to be a weapon. Both girls saw appellant dressed in a red coat, sweater and bandana just minutes before the shooting. Both saw appellant across the street from the bar and neither saw him across the street to where the shooting took place, keeping in mind that their attention was focused only on him. That was because they feared revenge from him as they tried to kill his girlfriend a few months earlier.

Lamont Cooper served as the corroborating witness, in that he saw appellant fire a gun into the air after the shooting at a different location. Shells from that location matched casings found in front of the bar. Just seconds after the initial shots he saw appellant wearing a red jacket and sweater (not a black leather coat).

Cooper didn't know whether appellant fired a revolver or semiautomatic (the former would not eject casings), and this was relevant because other casings and slugs were found in the area. Cooper heard four or five shots, but only saw appellant fire once into the air, by the corner of Sterling and South Avenue. He never saw appellant cross the street, which he would have had to do if the shooting took place at the bar. Appellant was seen across the street before the shooting and after the shooting.

Cooper was probably drunk at the time of the incident. Claims of sobriety aside he had three beers and two shots in the hour before the shooting (and probably more before) and went to Bo's Bar immediately after the shooting to drink some more.

The bartender Charles Williams was not a witness to the incident and did not testify at the first two trials. He was brought in at the last minute to show appellant's motive to kill decedent. Never mind that he never spoke to the police for nearly a year after the incident nor the family, despite the fact the he was friends with them, the truly amazing thing was his ability to recall an incident that occurred eleven months before, a disturbance a week before the shooting.

No reports, internal or external, were made regarding this scuffle. Dozens. If not hundreds of similar incidents took place at the bar that was known as a hotbed for trouble. Police were never called and no other bouncer apparently knew about the incident or told the police or any authorities. Williams photographic and encyclopedic knowledge of incidents did not extend to others, such as Clinton Hill, who also scuffled with decedent prior to the shooting. Apparently his memory could only be jogged as far as appellant was concerned.

On the defense side it should be noted that appellant turned himself into authorities as soon as he heard that they wanted to talk to him. While proof of flight is admissible as consciousness of guilt, the lower court denied defense counsel's request for the logical inverse instruction. Further, appellant was wearing the same cloths that he had on at the time of the incident, still unwashed. Police claims that this was immaterial was belied by the fact that they seized those cloths as evidence and eventually tested them for gunshot residue with negative results.

8

Naturally, the People claimed that absence of gunshot residue on appellant's cloths was insignificant, but the fact is that they saw fit to seize the cloths and belatedly tested them. Detective Vernon Thompson was of the impression that such test were useless after a few hours, but he failed basic criminalistics at the local community college. Test to reveal residue on hands had to be done within a short period of time, but clothing could retain detectable traces of residue for many months after exposure. The FBI expert, Sally Grew, brought in to rebut the defense expert on this matter offhandedly stated that the Bureau didn't take much stock in such tests to see if someone shot a gun, but in fact was that that organization, like the Syracuse Police, regularly did such tests.

Further, Ms. Grew had to admit that the amount of residue expelled through the slide varied from model to model. While residue was bound to deposit on those in the direction of the muzzle, it would be a fair statement that one firing ten to twelve rounds (the number of .25 caliber casings recovered) would be likely to have some trace of residue measurable on the cuff jacket of their shooting hand.

The far more likely explanation is that another person dressed in black or black leather, did the shooting. While appellant may have been in the area and may have been armed with some type of weapon, neither the eyewitness testimony nor forensics support the case that he was the shooter.

Given the above, appellant contends that his convictions stands in violation of his constitutional rights.U.S. Const. Amends. VI, XIV.

## POINT IV.

**THE TRIAL COURT ERRED IN SUMMARILY DENYING APPELLANT'S MOTION REQUESTING THE TRIAL COURT TO INSPECT THE GRAND JURY MINUTES AND DISMISS FOR DEFECTIVE GRAND JURY PROCEEDINGS. U.S. CONST. AMENDS. VI, XIV; N.Y. CONST. ART § 1.6.**

In the case at bar, defense counsel moved for inspection of the grand Jury minutes and dismissal of the indictment pursuant to Criminal Procedure Law § 210.20 and article 190, in that the grand jury proceedings were defective (A. 32-223).

Counsel included a laundry list of possible defects for the court to review, including improper resubmission,  extension, quorum, instructions  conduct, unauthorized persons present and the like (A. 32-33). Defense counsel also ask that the trial court inspect the grand jury minutes and dismiss for insufficiency (A. 34).

The trial court said that it would inspect the minutes for sufficiency but refused to review said minutes for legal defects, stating that there was no mechanism for such review, and  also refused to review and  dismiss for defective grand jury proceedings, indicating the following:

> Any motion to dismiss based upon grand jury defectiveness pursuant to CPL § 210.20(1)© must be in writing and it is further the "defendant's burden to demonstrate, on written notice to the People.  .  .the existence of defects impairing the integrity of the Grand Jury proceeding and giving rise to the possibility of prejudice". *People v. Santmyer*, 255 AD2d 871 (4th Dept. 1998). Admittedly, it is almost impossible for a defendant to raise defects based upon a record to which he is not privy. Nonetheless, the statues and case law are clear that a defendant must allege facts in support of a motion to dismiss on grand jury defectiveness. *Santmyer*, id; CPL § 210.20(1)©; CPL § 210.45. Defendant has failed to allege sufficient facts in support of his motion to dismiss on grand jury defectiveness grounds, and therefore that motion must be DENIED. (A. 18).

10

Appellant asserts that the trial court's decision to summarily deny his motion without even reviewing the grand jury minutes for enumerated defects violated his constitutional rights. U.S. Const. Amends. VI, XIV;  N.Y. Const. Art. § 1. 6.

### POINT V.

**THE TRIAL COURT ERRED IN ALLOWING BARTENDER CHARLES WILLIAMS TO TESTIFY TO APPELLANT'S BAD ACTS A WEEK PRIOR TO THE SHOOTING WITHOUT SHOWING HOW THE PROBATIVE VALUE OUTWEIGHED THE PREJUDICE.**

Prior to Charles Williams testimony, defense counsel objected to the expected proffer. The trial court held that William's observation of a scuffle between appellant and decedent a week before the shooting did not constitute a prior crime or bad act for the purpose of Ventimiglia and the prejudice was minimal. The People could elicit appellant's statement "I'll see you next week".

Defense counsel further objected that William's would say that appellant caused a disturbance at the bar after the altercation, kicking tables and yelling obscenities. Defense counsel's request for preclusion of such testimony as immaterial and prejudicial was denied by the court below, who refused to make a ruling on the matter (T3. 512-514). Such testimony did come in, and Williams further volunteered that one of his bouncers (name unknown) was hit by a broken bottle and required medical attention.

Here, appellant contends that the lower court's denial of his application to preclude such testimony was contrary to well established law and violated appellant's constitutional rights. U.S. Const. Amends. VI, XIV.

## *POINT VI.*

## THE LOWER COURT ERRED BY FAILING TO HOLD A HEARING TO ADDRESS APPELLANT'S MOTION PURSUANT TO CRIMINAL PROCEDURE LAW § 330.30 AND 330.50. U.S. CONST. AMENDS. VI, XIV; N.Y. CONST. ART. § 1. 6.

In the case at bar, defense counsel brought motions before the court to set aside and vacate the conviction, alleging the discovery of new evidence (A. 197-216). Defense alleged two separate pieces of information that would require a new trial. First, one Yakina Peterson recounted that James Walker, AKA "Tron" admitted to the shooting. Second, Ms. Peterson said that she saw appellant in the Price Store when the shots were going off. Such evidence was undiscoverable prior to trial as Ms, Peterson did not want to get involved (A.198-204).

Defense counsel submitted a subsequent affidavit addressing "due diligence" concerns by the court, noting that corroborating witnesses were difficult to contact, appellant did not know the names of other people in the store, he was learning disable and intoxicated.

In response the prosecution argued that the defense did not exercise due diligence in locating these reluctant witnesses . He also presented an affidavit from James Walker that, not surprisingly, denied any culpability or admission in the matter (A. 218-220).

On December 17, 2001, the trial court heard arguments from both ides and determined that the confession by James Walker to Yakina was not admissible evidence, even as a declaration against penal interest. As to other newly discovered evidence from witnesses placing appellant in the Price Right Store, the court found that, despite the fact witnesses were reluctant to be discovered or cooperate, that defense counsel failed to show due diligence (12/17/2001 Mot. 5-16).

13

Here, appellant contends that the trial court's ruling was contrary to well established law and violated his constitutional rights. U.S. Const. Amends. VI, XIV;  N.Y. Const. Art. § 1.6.

(attach additional papers as necessary)

14.    TIMELINESS OF PETITION: If your judgment of conviction was made final over one-year ago, you must set forth below why the one-year statute of limitations as codified in 28 U.S.C. § 2244(d) does not bar your petition.*

ON MAY 27, 2003, THE NEW YORK STATE COURT OF APPEALS DENIED

PETITIONER'S LEAVE TO APPEAL APPLICATION. THUS, PETITIONER'S   HABEAS

CORPUS PETITION IS TIMELY FILED IN THIS MATTER.

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as codified in 28 U.S.C. § 2244(d) provides in part that:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of --

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court and made

retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

15. Do you have a petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ☐   No ☒☒☒

(a) If so, give the name and location of court in which the petition or appeal is pending _____ **NONE** _____

_____

16. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐   No ☒☒

(a) If so, give name and location of court which imposed sentence to be served in the future: _____ **NONE** _____

_____

(b) Give date and length of the above sentence: _____ **NONE** _____

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

I declare under penalty of perjury that the foregoing is true and correct. Executed on

_7 - 21 - 04_
(date)

*Malik Robertson*
Signature of Petitioner

01-B-2810
Inmate Number

Auburn, Corr. Facility P.o. Box 618
Address Auburn, New York 13024

I declare under penalty of perjury that on _7-21-04_ , I delivered this petition to prison authorities to be
(date)

mailed to the United States District Court for the Southern District of New York.

*Malik Robertson*
Signature of Petitioner

# United States District Court

DISTRICT OF ___ NEW YORK ___

MALIK ROBERTSON

       **PETITIONER**

   –against–

DALE ARTUS, Superintendent of
Clinton Correctional Facility.

## APPLICATION TO PROCEED IN FORMA PAUPERIS, SUPPORTING DOCUMENTATION AND ORDER

CASE NUMBER:

---

I, __MALIK ROBERTSON__ _____, declare that I am the *(check appropriate box)*

☒ petitioner/plaintiff

☐ respondent/defendant     ☐ _____
                             *other*

in the above-entitled proceeding; that, in support of my request to proceed without being required to prepay fees, cost or give security therefor, I state that because of my poverty, I am unable to pay the costs of said proceeding or give security therefor; that I believe I am entitled to relief. The nature of my action, defense, or other proceeding or the issues I intend to present on appeal are briefly stated as follows:

In further support of this application, I answer the following questions.

1. Are you presently employed?                Yes ☐   No ☒
   a. If the answer is "yes," state the amount of your salary or wages per month, and give the name and address of your employer. (list both gross and net salary)

                       **N/A**

   b. If the answer is "no," state the date of last employment and the amount of the salary and wages per month which you received.
               **Inmate Wages per week = $** _____

2. Have you received within the past twelve months any money from any of the following sources?
   a. Business, profession or other form of self-employment   Yes ☐  No ☒
   b. Rent payments, interest or dividends?              Yes ☐  No ☒
   c. Pensions, annuities or life insurance payments?      Yes ☐  No ☒
   d. Gifts or inheritances?                        Yes ☐  No ☒
   e. Any other sources?                       Yes ☐  No ☒

LL/9